IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MICHAEL A. HENRIE,<br><br>    Plaintiff,<br><br>    vs.<br><br>NORTHROP GRUMMAN CORPORATION fka NORTHROP CORPORATION, NORTHROP GRUMMAN SYSTEMS CORPORATION, and NORTHROP GRUMMAN INFORMATION TECHNOLOGY, INC., and LORTZ MANUFACTURING COMPANY,<br><br>    Defendants. | ORDER GRANTING DEFENDANT NORTHROP GRUMMAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:04-CV-00296 PGC |

This products liability case arises from an accident that occurred while Mr. Henrie was using a painting device built by NGC at Hill Air Force Base.  Mr. Henrie alleged injuries caused by NGC from the use of the painting device based on strict liability, negligence, and breach of implied warranty claims.  For the following reasons, the court GRANTS NGC's renewed motion for summary judgment on all claims (#56).

**FINDINGS OF FACT**

For the purposes of this summary judgment motion, the court finds the following facts. First, an explanation of the painting device at issue in this litigation.  The device was known as the "glass fixture" among the Hill Air Force Base employees.[1]  The device had a fixture that

---

[1]Docket No. 55, Ex. B. at 53 (Henrie Deposition)

acted like a picture frame, and this picture frame rotated inside a wheel cart.[2] The device was the least used out of the eleven devices in the paint shop.[3] The device had four suctions cups with straps that wrapped around the glass as a secondary measure. It would hold an aircraft part in the horizontal position and could be wheeled around in order to permit transport and painting of whatever aircraft part had been loaded. The device included two pins which fit into ball bearing parts to prevent the picture frame from rotating spontaneously from the horizontal to vertical position, or vice-versa.[4] To rotate the aircraft part from the horizontal to vertical position in the device, an employee would have to pull each locking pin. The pins would then have to be reinserted afterwards.[5] While the two pins were removed, the aircraft part could rotate freely in the device, especially if the aircraft part was off center.[6] And once these pins were removed there was nothing to prevent the aircraft part from spinning.[7] Employees held the bottom of the aircraft part with their hands when the locking pins were pulled to prevent the part from rotating too quickly.

On July 19, 2001, Mr. Henrie was injured by the painting device while working as a civilian employee at Hill Air Force Base. He had been employed as a painter at the base for twenty-three years and had been working as a painter in the B-2 bomber program for about one-and-a-half years. Before being injured, Mr. Henrie was at the Pico Rivera Plant for eight weeks

---

[2]*Id*. at 52-53.

[3]*Id*.

[4]*Id*. at 79-80.

[5]*Id*. at 80-81.

[6]*Id*. at 81, 83.

[7]*Id*. at 130.

of actual production work for the B-2 program.  In October 1999, he went to NGC's Pico Rivera, California plant for 30 days of training and also received six weeks of training at the same plant a few months later.  After all this training, Mr. Henrie used the glass fixture (or one of the ten other similar devices) every day in the paint shop from January 2000 until July 19, 2001.

The painting device had been modified by the Air Force four or five months before Mr. Henrie's accident.  As part of the modification, the Air Force attached a point that would swivel, with a part hanging in a certain point, so it would not allow the aircraft part to turn into the fixture.[8]  This modification apparently felt dangerous to Mr. Henrie, however, and so he and his fellow employees had Air Force engineering weld the fixture solidly to the frame.[9]  Mr. Henrie and another co-worker developed the procedure for using the device at Hill Air Force Base, and NGC did not provide any instruction on how to load, unload, or use the painting device.[10]

Mr. Henrie injured his elbow and shoulder when the device spun out of control after he and another employee simultaneously removed the pins that held the aircraft part in place.  Specifically, he suffered a fracture of the right distal radius and a fracture/dislocation of the right elbow.  Mr. Henrie and the other employee attempted to unload an aircraft part from the device and put it in a shipping crate.  He called for help and noticed people coming to help them lower the aircraft part from the vertical to the horizontal position.  None of those employees actually helped him lower the aircraft part, and the part spun to crush his arm.  After pulling the pin on the device, Mr. Henrie reached with his right arm to rotate the aircraft part from vertical to

---

[8] *Id*. at 50.

[9] *Id*. at 51

[10] *Id*. at 58, 62.

horizontal, the part suddenly rotated, and either the aircraft part or the picture frame collided with his arm.[11]

Both sides have offered expert evidence on the device. NGC's expert, Jerry Leininger, was the engineer responsible for the design of the attachment of the picture frame to a dolly that resulted in the fabrication of the device for Hill Air Force Base. Mr. Leininger states that the device was a tool used nationwide by many companies. He did not believe there was a need for hazard analysis on the device because it had been running in plants all over the United States without an accident for over 15 years. Using the device to build different B-2 bombers for the United States Air Force, the device interacted with each part slightly differently because of the different configurations and weight for each part of the bomber.

Mr. Henrie's expert, Dr. Eberhard Bamberg, writes in his expert report that the device could have been made safer by a practicable alternative design of placing pivots onto the aircraft part's center of gravity and adding a crank to the device. Since the device's inner frame was inherently unstable, placing rotation points around the airplane part's center of gravity would have alleviated the instability. Dr. Bamberg states that this design alternative would have likely prevented Mr. Henrie's accident, and also states that the installation of a worm gear drive would have completely eliminated the hazard to employees being in the rotational path of the aircraft part. Dr. Bamberg also opined that NGC failed to follow basic hazard analysis in designing the painting device. For the purposes of this motion, NGC does not oppose Dr. Bamberg's opinion that there was a safer and practicable alternative design for the device.

It is important to note the specialized nature of the device, along with the secrecy

---

[11]*Id*. at 81, 84-85.

involved in the depositions and questioning for this case. The Air Force specifically contracted NGC to produce eleven devices for painting of B-2 bombers at Hill Air Force Base. The eleven devices are configured to hold each piece of the B-2 bomber that is being painted. Hill Air Force Base is the sole base that uses these devices, as it is responsible for painting all B-2 bombers currently in service. As such, the devices were highly specialized, given solely to the U.S. military, and unavailable for any public use.

In his amended complaint, Mr. Henrie raised claims under Utah law for strict liability, design defect, negligence, failure-to-warn claim, and breach of the implied warranty of merchantability and fitness for a particular purpose. NGC has filed this pending motion for summary judgment.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[12] The court must view the evidence, and draw reasonable inferences from that evidence, in the light most favorable to the nonmoving party, which is Mr. Henrie.[13] Mr. Henrie may not, however, "rest on mere allegations or denials of [their] pleading, but must set forth specific facts showing there is a genuine issue for trial."[14]

---

[12] Fed. R. Civ. P. Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).

[13] *Cummings*, 393 F.3d at 1189; *Spaulding v. United States*, 279 F.3d 901, 904 (10th Cir. 2002).

[14] *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

"In cases arising under a federal court's diversity jurisdiction, the task of the federal court is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law."[15]  Of course, the federal court looks to the most recent decision of the state's highest court, but when no controlling decision exists, "the federal court must attempt to predict what the state's highest court would do."[16]  And when the Tenth Circuit has issued a decision "interpreting state law, that interpretation is binding on district courts in this circuit . . . unless an intervening decision of the state's highest court has resolved the issue."[17]  Thus, this court looks to the Utah Supreme Court for guidance on Utah strict product liability and negligence claims, but is also bound to follow the Tenth Circuit's decisions on these issues unless the Utah Supreme Court has issued an intervening decision.

*A. The Device Was Not Unreasonably Dangerous and Mr. Henrie's Strict Product Liability Claims Fail.*

In order for Mr. Henrie to prevail on his strict liability claims, he must show that the device was (1) "unreasonably dangerous" due to a "defect or defective condition," (2) that the defect existed "at the time the product was sold," and (3) the defect caused Mr. Henrie's injuries.[18]  And as the Tenth Circuit has noted, "[u]nreasonable dangerousness consistently appears as a prerequisite and touchstone to recovery in tort for damages cause by a defective

---

[15] *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003).

[16] *Id.*

[17] *Id.*

[18] *Id.*; *see also Lamb v. B&B Amusements Corp.*, 869 P.2d 926, 929 (Utah 1993); *Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct. App. 1994).

product."[19]

NGC argues that Mr. Henrie must have evidence that the device had a defective condition which made it unreasonably dangerous under Utah Code Ann. § 78-15-6. NGC argues that proof of a safer and practicable design does not solely establish that the device had a defect which made it unreasonably dangerous. NGC therefore argues that according to the statute, Mr. Henrie has failed to show that the design and manufacture of the device made it unreasonably dangerous beyond what would be contemplated by the ordinary and prudent user.

Utah's product liability statute reads:

§ 78-15-6. Defect or defective condition making product unreasonably dangerous --
Rebuttable presumption

In any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product:

(1) No product shall be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

(2) As used in this act, "unreasonably dangerous" means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user or consumer.

(3) There is a rebuttable presumption that a product is free from any defect or defective condition where the alleged defect in the plans or designs for the product or the methods and techniques of manufacturing, inspecting and testing the product were in conformity with government standards established for that industry which were in existence at the time the plans or designs for the product or the methods and techniques of manufacturing, inspecting and testing the product were adopted.[20]

---

[19] *Diatom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1581 (10th Cir. 1984).

[20] UTAH CODE ANN. § 78-15-6.

As part of its argument that the device was not "unreasonably dangerous beyond what would be contemplated by the ordinary and prudent user," NGC contends that Mr. Henrie had superior perception of the device's danger. It also argues that, under the Tenth Circuit's decision in *Brown v. Sears, Roebuck & Co.*,[21] summary judgment is proper because he has failed to offer evidence to establish that the device had a defect in its manufacture or design that made it unreasonably dangerous. In particular, NGC argues that *Brown* requires a plaintiff to prove that he was not subjectively aware of the danger from the device. Mr. Henrie counters that Utah does not recognize the "open and obvious doctrine" as a complete bar to strict liability, and also argues that the Utah Supreme Court has found § 78-15-6 unconstitutional through holding § 78-15-3 unconstitutional in *Berry v. Beech Aircraft Corp.*[22] Mr. Henrie also argues that another Tenth Circuit decision, *Wankier v. Crown Equipment Company*,[23] effectively eviscerated *Brown*, and that *Brown* therefore does not apply to his claims. His counsel does concede, however, that if *Brown* is still good law and applies, Mr. Henrie's claims are unpersuasive and summary judgment is appropriate.

Turning first to Mr. Henrie's claim that § 78-15-6 is unconstitutional, the court finds this argument unpersuasive. In 1985, in *Berry*, the Utah Supreme Court held that § 78-15-3 was unconstitutional, finding that the remainder of the Utah Product Liability Act, which included § 78-15-6, could not be severed from § 78-15-3 and was therefore also invalid.[24] A subsequent

---

[21]328 F.3d 1274 (10th Cir. 2003).

[22]717 P.2d 670, 686 (Utah 1985).

[23]353 F.3d 862.

[24]*Id.*

Utah Supreme Court case informs the court on the current status of the Utah law, noting that the "legislature repealed and amended certain sections in an apparent effort to comply with the court's concerns. Although section 78-15-6 was neither repealed, amended, nor specifically reenacted, there is no indication that the legislature has changed its policy regarding deference to governmental standards."[25] And numerous Utah cases have since analyzed claims under § 78-15-6.[26] Finally, the Tenth Circuit itself has commented on § 78-15-6 in *Taylor v. Cooper Tire & Rubber Co.*[27] and *Brown*. All of this leads the court to believe that § 78-15-6 is constitutional and applicable to this case, especially given that the Tenth Circuit has not questioned its constitutionality.[28]

Turning then to the application of *Brown* to this case, *Brown* examined the limitations imposed on a strict products liability claim by § 78-15-6. To explain the meaning of "unreasonably dangerous," the Tenth Circuit cited comment i of § 402A of the Restatement (Second) of Torts, which Utah courts first followed in *Ernest W. Hahn, Inc. v. Armco Steel Company*.[29] This comment states: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary

---

[25] *Grundberg v. Upjohn Co.*, 813 P.2d 89, 97 n.7 (Utah 1991).

[26] *See Slisze v. Stanley-Bostitch*, 979 P.2d 317, 319-20 (Utah 1999); *House v. Armor of Am.*, 886 P.2d 542, 547 (Utah Ct. App. 1994); *Maack v. Resource Design & Constr.*, 875 P.2d 570, 582 (Utah Ct. App. 1993); *see also Nay v. General Motors Corp*, 850 P.2d 1260, 1263 (Utah 1993) (citing to § 78-15-6).

[27] 130 F.3d 1295 (10th Cir. 1997).

[28] *See, e.g.*, *Brown*, 328 F.3d 1274; *Taylor*, 130 F.3d 1295.

[29] 601 P.2d 152, 156-58 (Utah 1979); *see also Burns*, 876 P.2d at 418 (applying a three-part test" that a plaintiff must satisfy to sustain a cause of action for strict products liability).

knowledge common to the community as to its characteristics."[30]  *Brown* noted that the Restatement comment "articulates an objective test.  The state of mind of the product's actual user, or victim, is irrelevant.  The issue, roughly speaking, is whether an ordinary person would think the product is less dangerous than it is."[31]  Such an objective test is commonly referred to as the "consumer expectations test," whereas a test that looks solely to the "product's characteristics, propensities, risks, dangers and uses" is commonly discussed as a risk utility test.[32]

The *Brown* court rejected the notion that the Utah statute created a risk-utility test, instead concluding that "the features of the product are to be considered only for the purpose of determining what would be contemplated by ordinary, prudent persons of the community."[33]  Looking at the statute, the Tenth Circuit then read the statute's term "together with" as conveying culmination of "(1) an ordinary person's understanding of the product, 'together with' (2) the understanding possessed by the particular person."[34]  Thus, *Brown* read "§ 78-15-6(2) as imposing an objective consumer expectations test and supplementing it with a subjective test based on the individual knowledge, training, and experience of the particular buyer, user, consumer, or, possibly, victim.  Such individual information regarding the product would ordinarily increase the particular person's appreciation of the product's danger."[35]  *Brown* holds

---

[30] RESTATEMENT (SECOND) ON TORTS, § 402A, cmmt. i.

[31] *Brown*, 328 F.3d at 1280.

[32] *Id*.

[33] *Id*. at 1281.

[34] *Id*. at 1282.

[35] *Id*.


that a product is defective if its "actual dangers exceed its perceived dangers."[36]

In this case, Mr. Henrie was a highly skilled user of the painting device. Indeed, he had even made his own modifications of the device. In light of these facts, Mr. Henrie's counsel admirably concedes that if *Brown* applies to this case, then Mr. Henrie's claim does not survive summary judgment. Mr. Henrie contends, however, that *Brown* has been overruled by the subsequent Tenth Circuit decision in *Wankier v. Crown Equipment Corporation*.[37]

At issue in *Wankier* was whether the district court should have instructed the jury that a plaintiff alleging a design defect in a strict liability action must prove the existence of a safer alternative design, practicable under the circumstances and available at the time the defendant placed the product in the stream of commerce.[38] The jury instructions requested by the defense in that case included existence of a safer alternative design *as one of the elements* of a strict liability claim.[39] These elements also included, among others, "that the [defendant] manufactured a product which, at the time it was sold, was in a defective condition that made the product *unreasonably dangerous* to the user."[40] The district court's actual instructions included an instruction regarding the product being "unreasonably dangerous for its anticipated or reasonably foreseeable use," but did not mention the existence of an safer alternative design.[41] The sole issue before the Tenth Circuit in *Wankier* became whether an additional element – existence of a

---

[36]*Id.*

[37]353 F.3d 862.

[38]*Id.* at 866.

[39]*Id.* at 865-66.

[40]*Id.* (emphasis added).

[41]*Id.* at 866.

safer alternative design – must also be found by a preponderance of the evidence by the jury.

The Tenth Circuit found that the Utah Supreme Court had not addressed whether the plaintiff bears such a burden, but noted that the authors of the *Restatement (Third) of Torts* had adopted the requirement of a safer alternative design in 1998.[42]  While not discussing the "unreasonably dangerous"definition in § 78-15-6, the Tenth Circuit looked to its earlier decision in *Allen v. Minnstar, Inc.*[43]  *Allen* held that proof of a safer alternative design was an element of strict product liability actions.  The plaintiff in *Allen* argued, among other things, that he "had presented competent proof of each element of his strict products liability claim – that the product was defective and unreasonably dangerous and that [he] was injured as a result of the defective condition – and the district court's requirement of proof of availability of a safer and feasible alternative was error."[44]  The *Allen* court held otherwise, and *Wankier* followed *Allen* to hold that an alternative design is a necessary element of strict product liability jury instructions.

Thus, the court is left with two opinions from the Tenth Circuit within six months of each other, but discussing very different issues on strict products liability claims.  *Brown* discusses the "unreasonably dangerous" doctrine, and finds that there are two tests – the objective and subjective tests – that must be met before a plaintiff may survive summary judgment on strict product liability claims.  *Wankier* discusses one proper element of the jury instructions that must be given to a jury in a strict product liability cause of action.  As a result, with regard to defining the "unreasonably dangerous" element, *Brown* appears to be the last word for this court, while

---

[42]*Id*. at 866 n.3.

[43]8 F.3d 1470 (10th Cir. 1993).

[44]*Id*. at 1477.

*Wankier* appears to be the last word on the "safer alternative design" element.  The court sees no disagreement between these two cases, and both cases must be followed here. Indeed, if Mr. Henrie is correct that existence of a safer alternative design is all one needs to prove strict product liability, then the Tenth Circuit would not have required that element as an *additional* element in the jury instructions in *Wankier* or *Allen*.  Or the Tenth Circuit would have struck the "unreasonably dangerous" references in the jury instructions and only required proof of a safer alternative design.  As a result, Mr. Henrie has the burden of showing that the device was "unreasonably dangerous" according to the objective and subjective tests laid out in *Brown*.  And down the road, Mr. Henrie then must demonstrate the availability and feasibility of a safer alternative design.  But the court is not at that point yet, and first looks at whether Mr. Henrie has hurdled *Brown*'s objective and subjective tests to demonstrate the product's unreasonable dangerousness.

      Mr. Henrie has demonstrated that there was a defect in the device through offering Dr. Bamberg's expert report.  That expert report concludes that the device was "inherently dangerous" due to the instability of the center of gravity of the device.  The report also provides enough evidence to permit a jury to conclude that the product was unreasonably dangerous "to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community,"[45] thereby meeting *Brown*'s objective test requirement.

      But these statements alone do not, under *Brown*, sufficiently overcome § 78-15-6(2)'s corollary subjective test.  The subjective test "can only work against a plaintiff's claim that a product is unreasonably dangerous because it increases the extent of the perceived dangers

---

[45] UTAH CODE. ANN. § 78-15-6(2).

beyond that contemplated by the ordinary and prudent person."[46]  It is undisputed that Mr. Henrie's "knowledge, training, and experience" demonstrate that Mr. Henrie understood and contemplated the risks involved with the device.  He had trained on a similar device extensively, had used the device without incident for over a year and a half, and even engaged in modifications before the accident to make the device safer.  The device was used only by him and others in his paint shop at Hill Air Force Base and was not in public use.   Indeed, while this accident is tragic, Mr. Henrie knew and anticipated the risk of using the device without help from other employees, and attempted to get help from those employees before removing the pins.  All of this leads the court to believe that, even if an ordinary, prudent person would not have understood the risks or dangers involved with the device, he had an appreciation of those dangers.  Consequently, Mr. Henrie has not hurdled the subjective test laid out in *Brown* to show that the device was "unreasonably dangerous" according to § 78-15-6.  The court therefore grants NGC's motion for summary judgment on the strict product liability design and manufacturing claims.

Because the court grants NGC's motion for summary judgment on the design and manufacturing strict product liability claims, all that is left with regard to the strict product liability claim is a duty-to-warn claim.  NGC argues that the Utah Supreme Court in *House v. Armour of America, Inc.*,[47] recognized a "sophisticated user" defense in strict product liability duty-to-warn cases.  "To sustain a conclusion that no duty was owed to the user because of his professional status, the court must find the record evidence to be undisputed that the user actually

---

[46]*Brown*, 328 F.3d at 1282.

[47]929 P.2d 340, 345 (Utah 1996).

knew of the danger or that, based on the user's special expertise and the circumstances of the transaction, the supplier reasonably could have believed that he knew of the danger."[48] Although *House* found that the evidence of training and knowledge by a police officer using a bulletproof vest to be lacking in that case, here it is clear to the court that Mr. Henrie was a sophisticated user of the painting device. Given his extensive training, his year-and-a-half using this device and ten others like it every day at work, and his own admissions that he knew of the dangerousness of the device, along with his own actions to engage in modifications of the device, the court finds Mr. Henrie clearly has special expertise and actually knew of the danger.[49] Summary judgment is therefore appropriate on this claim as well.

### C. Mr. Henrie's Negligence Claim Also Fails

To sustain a negligence claim, Mr. Henrie must show that NGC had a duty of reasonable care owed to him and breached that duty.[50] Mr. Henrie claims that NGC was negligent for failing to install a safety mechanism to prevent the free rotation of the inner frame when loaded with an aircraft part after the two pins were removed. He offers Dr. Bamberg's report, which concludes that the device was inherently dangerous, while offering evidence of a safer, alternative device. That report also offers the conclusion that the design ignored basic hazard analysis, based on the design itself, but Mr. Henrie offers no other proof that NGC ignored such analysis except for Dr. Bamberg's conclusion garnered solely from examining the device.

---

[48] *Id.* at 345 (internal quotations omitted).

[49] Henrie Deposition, at 72 ("I yelled for help . . . they were aware we were going to need help."); *see also id.* at 49 (discussing that part of the device was "dangerous" and describing how "engineering got involved" to alter certain aspects of the device.); *id.* at 86 (stating that when he had used the device before, he had noticed that the glass was top-heavy).

[50] *Slisze*, 979 P.2d at 320.

The Utah Supreme Court has not, however, recognized a duty "to refrain from marketing a non-defective product when a safer model is available."[51]  As was the case in *Brown*, Mr. Henrie's claim "amounts to no more than an argument that even if the [painting device] was not defective under § 78-15-6(2), it was nevertheless negligent of [NGC] to market [and manufacture] it because an alternative safer design was available.  Thus, the claim is barred by *Slisze*."[52]  And a "manufacturer has a duty to warn against a product's latent hazards that are known to the manufacturer but unknown to the consumer."[53]  It is undisputed, however, that Mr. Henrie knew of the painting device's latent hazards given that his training, knowledge, experience, and admissions.

Because the product was not "unreasonably dangerous" under § 78-15-6(2) and *Brown*, Mr. Henrie's negligence claim is also subject to summary judgment.  Although Mr. Henrie produces the conclusion of his expert that NGC breached its duty by ignoring basic hazard analysis, he offers no evidence that NGC actually ignored basic hazard analysis or engaged in faulty hazard analysis. Accordingly, the court GRANTS NGC's motion for summary judgment on Mr. Henrie's negligence claims.

*D. Mr. Henrie's Breach of Implied Warranty Claim Similarly Fails*

Finally, Mr. Henrie argues that the device was not suitable for its intended purpose, breaching the implied warranty merchantability and fitness.  Utah Code Ann. § 70A-2-314 states that goods shall be "fit for the ordinary purposes for which such goods are used."  The device's

---

[51]*Id.*; *see also Brown*, 328 F.3d at 1283.

[52]*Brown*, 328 F.3d at 1283.

[53]*Slisze*, 979 P.2d at 321.

purpose was to hold in place certain aircraft parts while employees could paint them.  As long as the safety pins were in place, which are included as part of the device, the device worked properly and was fit for its purpose.  Indeed, when those pins were removed, the device still functioned in accordance with its purpose, because the aircraft parts stayed attached to the device, although the part now freely rotated.  Mr. Henrie has not presented any evidence to show that the device was not suitable for its intended purpose, which was to secure an aircraft part in order to paint that part.  Although Dr. Bamberg's expert report states the device was inherently dangerous and could be altered to become safer, he does not state that the device was unsuitable for its intended purposes.  As such, Mr. Henrie has failed to offer any evidence of NGC's breach of implied warranty under Utah Code Ann. § 70A-2-314, and the court GRANTS NGC's motion for summary judgment on this claim.

## CONCLUSION

The court GRANTS NGC's renewed motion for summary judgment on the strict product liability claims, the negligence claim, and the breach of implied warranty claim (#56).  The clerk's office is directed to close this case.

DATED this 24th day of April, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge